JAMES E. MATZEK AND CHERYL D. MATZEK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Matzek v. Commissioner
Docket No. 5426-89
United States Tax Court
T.C. Memo 1992-603; 1992 Tax Ct. Memo LEXIS 633; 64 T.C.M. (CCH) 1056; October 8, 1992, Filed *633 Decision will be entered under Rule 155. Petitioner wife (W) performed daycare services in petitioners' home. Petitioners filed joint tax returns for the years in issue, on which tax returns they treated W as an employee of petitioner husband (H) and did not pay self-employment taxes on her salary. Held: W was not H's employee. Rather, W was self-employed and consequently petitioners are liable for self-employment taxes. Sec. 1401, I.R.C. 1954. For Petitioners: John N. Moore. For Respondent: Dawn Marie Krause. CHABOT
CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income taxes and additions to tax under sections 6653(a) [1] *634 (negligence, etc.) and 6659(a) (understatement of tax due to overvaluation) against petitioners as follows: Year
Deficiency [1]
Sec. 6653(a)
1980
$   612
$ 30.60
1982
3,117
--  1983
527
--  1984
5,824
--  Additions to Tax
Year
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6659(a)
1980
--
--
--  1982
$ 155.85
[2] $ 373.50
1983
26.35
[3] --   1984
291.20
[4] 526.50
Also, respondent determined that the entire deficiencies for 1982 and 1984 are subject to increased interest under section 6621(c). After concessions by both sides and a deemed concession by petitioners, [2] the issue for decision is whether petitioner wife has income from JEM Daycare that is subject to self-employment taxes and, if so, then in what amounts. *635 FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition was filed in the instant case, petitioners James E. Matzek (hereinafter sometimes referred to as James) and Cheryl D. Matzek (hereinafter sometimes referred to as Cheryl), husband and wife, resided in Strongsville, Ohio. In 1982, James was employed by LTV Steel as a safety inspector. Generally, he left for work between 7:15 a.m. and 7:30 a.m. and returned home between 5:15 p.m. and 5:30 p.m. Cheryl had been working outside the home for several years. Petitioners had three children, two of whom were in school in 1982 through 1984. Cheryl wanted to remain home with the youngest child, but petitioners could not afford for her to do so. James conceived of an in-home baby-sitting or daycare business to provide additional income to help pay petitioners' monthly bills. In 1980, Cheryl had received $ 2,308 in income from providing daycare services. Petitioners reported this income, and Cheryl's self-employment tax on this income, on their 1980 joint tax return. The business that James contemplated was established as "JEM *636 Daycare". During 1982, petitioners also began investing in certain tax shelters. [3]
Petitioners established a checking account for JEM Daycare, in the name of "James E. Matzek Special Account". Both James and Cheryl had signature authority on this account. All of the JEM Daycare business deposits and expenses were run through this account. One-third of the 1982 checks on the JEM Daycare account were signed by Cheryl in her own name. About a dozen of the 1983 checks were signed by Cheryl, either in her own name or in James' name with his consent. James determined the service rates based in large part on what he and Cheryl had paid for daycare and set Cheryl's salary at $ 6,000 per year. JEM Daycare was advertised in local newspapers. James arranged for newspaper advertising; Cheryl signed his name to the checks which paid for it. James bought *637 the food and supplies; Cheryl planned and served the children's meals. Both petitioners interviewed parents and children; both petitioners showed them the house and yard. Cheryl showed them where the toys were, where the children would nap, and what kind of diapers would be used. Cheryl described to the parents the activities she would conduct. Cheryl collected payments from parents and deposited those amounts in JEM Daycare's checking account. The children for whom JEM Daycare provided daycare services ranged from 6 weeks to 10 years old. Cheryl kept the records of the days, and times of day, that the children attended JEM Daycare. Cheryl was the one who cared for the children who came to JEM Daycare. In 1983 and 1984, James was an automobile salesperson with Karg Dodge. (Karg Dodge's name later was changed to Strongsville Dodge.) He left for work at 8:45 a.m. and returned home about 7:30 p.m. 3 days a week, and about 11 to 11:30 p.m. 2 days a week. JEM Daycare was closed in the end of 1984. Cheryl returned to working outside the home in 1988. Schedule C of petitioners' 1982 tax return lists the gross receipts of JEM Daycare as $ 9,764 and a net profit of $ 44. Petitioners *638 claim a $ 6,000 deduction for Cheryl's salary. Checks totaling $ 9,399.75 were written to her individually bearing the notation "Salary". The $ 6,000 deducted on the Schedule C is reported as wage income on line 7 of the Form 1040 and also figures in the calculation of petitioners' two-earner deduction (Sched. W, line 29 of Form 1040). In the notice of deficiency, respondent treats the $ 6,000 as part of Cheryl's net profit from JEM Daycare. (A disallowance of $ 226 of petitioners' claimed $ 2,834 business use of home deduction is not disputed by petitioners.) Schedule C of petitioners' 1983 tax return lists the gross receipts of JEM Daycare as $ 10,044 and a net loss of $ 366. The total deposits to the JEM Daycare account were $ 9,897.25. Petitioners claim a $ 6,000 deduction for Cheryl's salary. Checks totaling $ 9,675 were written to her individually bearing the notation "Salary". The $ 6,000 deducted on the Schedule C is reported as wage income on line 7 of the Form 1040 and also figures in the calculation of petitioners' two-earner deduction (Sched. W, line 29 of Form 1040). In the notice of deficiency, respondent treats the $ 6,000 and the $ 366 net loss ($ 5,634), *639 as Cheryl's net profit from JEM Daycare. Schedule C of petitioners' 1984 tax return lists the gross receipts of JEM Daycare as $ 14,273 and a net profit of $ 3,371. [4] The total deposits to the JEM Daycare account were $ 14,488.54. Petitioners claim a $ 6,000 deduction for Cheryl's salary. Checks totaling $ 14,254 were written to her individually with the notation "Salary" on each. The $ 6,000 deducted on the Schedule C is reported as wage income on line 7 of the Form 1040 and also figures in the calculation of petitioners' two-earner deduction (Sched. W, line 30 of Form 1040). In the notice of deficiency, respondent treats the $ 6,000 as part of Cheryl's net profit from JEM Daycare. (A disallowance of $ 1,377 of petitioners' claimed $ 4,207 business use of home deduction is not disputed by petitioners.) Cheryl's remuneration varied from *640 week to week and checks to her from the JEM Daycare checking account closely paralleled the business' deposits. * * * Cheryl was not James' employee during 1982 through 1984; she was, instead, self-employed. OPINION Petitioners contend that the owner of the JEM Daycare business is James, who held the bank accounts in his name, signed almost all of the checks, and made most of the controlling decisions. Respondent contends that Cheryl was the owner of the business and petitioners are therefore liable [5] for self-employment taxes. Neither party considers the enterprise a co-ownership or partnership.
We agree with respondent. Section 1401 imposes *641 taxes on the self-employment income of every individual. Section 1402(b) defines "self-employment income" as "net earnings from self-employment", with exceptions not here relevant. Section 1402(a) defines "net earnings from self-employment" by relation to "income derived by an individual from any trade or business carried on by such individual," again with exceptions not here relevant. Section 1402(c)(2) defines "trade or business" by relation to section 162, but excludes "the performance of service by an individual as an employee," again with exceptions not here relevant. Section 1402(d)[6] directs us to chapter 21 for the meaning of "employee". "Employee" is defined for purposes of chapter 21 (and so, also for purposes of section 1402) in section 3121(d)(2) [7] by reference to the usual common law principles for determining the employer-employee relationship. Section 31.3121(d)-1(c), Employment Tax Regs., defines the common law employer-employee relationship as follows: § 31.3121(d)-1 Who are employees. * * * (c) Common law employees. (1) Every individual is an employee if under the usual common law rules the relationship between him and the person for whom he performs *642 services is the legal relationship of employer and employee. (2) Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. * * * *643 The determination of whether an individual is an employee is predominantly a question of fact. Matthews v. Commissioner, 92 T.C. 351, 360 (1989), affd. 907 F.2d 1173 (D.C. Cir. 1990); Professional & Executive Leasing v. Commissioner, 89 T.C. 225, 232 (1987), affd. 862 F.2d 751, 753 (9th Cir. 1988); Packard v. Commissioner, 63 T.C. 621, 629 (1975). Petitioners have the burden of proving that respondent's deficiency determination is erroneous. Rule 142(a). The courts have identified several factors to be considered in determining whether an individual is an employee of an alleged employer. Among these factors are the following: (1) The alleged employer's right to control the manner in which the work is to be performed; (2) whether the individual performing the work has an opportunity for profit or loss; (3) the individual's investment in the work facilities; (4) whether the service rendered requires a special skill; (5) the degree of permanence of the working relationship; (6) whether the service rendered is an integral part of the *644 alleged employer's business; and (7) the intent of the parties. United States v. Silk, 331 U.S. 704, 716 (1947); Professional & Executive Leasing v. Commissioner, 89 T.C. at 232; see also Simpson v. Commissioner, 64 T.C. 974, 984-985 (1975). The relative importance of the factors must be viewed under the special facts and circumstances of each case. United States v. Silk, supra; Simpson v. Commissioner, 64 T.C. at 985. At the outset, we note that analysis of intrafamily transactions is a difficult area. This Court's position long has been that it is an elementary proposition of tax law that intrafamily transactions are subject to strict scrutiny. E.g., Frazee v. Commissioner, 98 T.C. 554, 562 (1992); Hoffman v. Commissioner, 3 B.T.A. 964, 967 (1926). Sales between family members are scrutinized with greater skepticism than sales between unrelated parties. Bowen v. Commissioner, 78 T.C. 55, 78 (1982), affd. 706 F.2d 1087 (11th Cir. 1983); *645 Wrenn v. Commissioner, 67 T.C. 576, 584 (1976). A purported loan between family members is always subject to strict scrutiny. Caligiuri v. Commissioner, 549 F.2d 1155, 1157 (8th Cir. 1977), affg. T.C. Memo. 1975-319; Estate of Reynolds v. Commissioner, 55 T.C. 172, 201 (1970). We note that the determination of the business relationship between a husband and a wife and the respective levels of control and responsibility of each is difficult. One of the few cases to construe self-employment and employer-employee relationships within the family is O'Brien v. Commissioner, 79 T.C. 776, 779-782 (1982), revd. on another issue 771 F.2d 476 (10th Cir. 1985). [8] In O'Brien, this Court considered the status of the taxpayers' son, who had been hired by the taxpayers to perform accounting and data processing services. The taxpayers did not control or supervise the manner in which he performed his services; he worked in his own room or at a university computer laboratory, and not at the taxpayers' place of business. *646 He set his own hours. The taxpayers gave him various tasks and he was free to use his own skills, knowledge, and discretion to reach the desired result. Based on those facts, the Court concluded that he was not an employee. The facts in the instant case are even stronger for respondent than the facts in O'Brien. The most striking element in the instant case is that Cheryl's services did not merely relate to the business, they were the business. Put another way, without *647 Cheryl there were no daycare services and there was no daycare business. The next most striking element is that almost all of the JEM Daycare gross receipts were paid to Cheryl by way of checks bearing the notation "Salary", as shown in the following table. "Salary" checks as %
Year
Gross Receipts
"Salary" checks
of Gross Receipts
1982
$  9,764
$  9,399.75
96.3
1983
10,044
9,675.00
96.3
1984
14,273
14,254.50
99.9
The $ 6,000 annual salary deductions on petitioners' tax returns bore no relation to the actual events. In addition to furnishing all the daycare services, Cheryl collected all the receipts. The physical facilities where the JEM Daycare business was located were in petitioners' home. The record does not tell us whether both petitioners, or only one, owned the house, so we cannot conclude who furnished the facilities. Because the toys, games, and other supplies apparently were paid for out of the business receipts, we cannot conclude who furnished those materials. James' jobs, as a safety inspector (1982) and an automobile salesperson (1983 and 1984), left him with little time to do anything with regard to JEM Daycare. The most that can *648 be said of James' participation in JEM Daycare is that he shared with Cheryl in much of the policy-level decision-making. We conclude, for the reasons set forth above, that Cheryl was not an employee of James. [9]
*649 Both parties contend that the relationship is not a partnership or other co-ownership. We conclude that Cheryl was self-employed, that the net profit of JEM Daycare constitutes Cheryl's self-employment income, and that petitioners are therefore liable (see supra note 5) for self-employment taxes on her income. We hold for respondent. In order to give effect to respondent's concessions on other matters, Decision will be entered under Rule 155. Footnotes
1. Unless indicated otherwise, all section, chapter, and subtitle references are to sections, chapters, and subtitles of the Internal Revenue Code of 1954 as in effect for the years in issue.↩
1. Of these amounts, the following amounts are self-employment taxes under ch. 2: 1982 -- $ 586; 1983 -- $ 527; 1984 -- $ 1,215. These remaining amounts are income taxes under ch. 1. ↩
2. The addition to tax is 50 percent of the interest on $ 3,117. ↩
3. The addition to tax is 50 percent of the interest on $ 527. ↩
4. The addition to tax is 50 percent of the interest on $ 5,824.↩
2. On brief, petitioners fail to argue the negligence addition issue; we treat this as, in effect, a concession by petitioners that they are liable for additions to tax under sec. 6653(a) with respect to so much of the deficiencies as are attributable to our holding, infra, that petitioner wife has income from JEM Daycare that is subject to self-employment taxes. See subpars. (4) and (5) of Rule 151(e); Money v. Commissioner, 89 T.C. 46, 48 (1987). Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice & Procedure.↩
3. The parties have stipulated the correctness of respondent's notice of deficiency adjustments with regard to Children's Classics, Structured Shelters, and Super Swirl.↩
4. A $ 11,782 loss from "investment" reported on another Schedule C for James for 1984 was used by James to avoid a self-employment tax liability on the JEM Daycare net profit.↩
5. The filing of a joint return makes both petitioners liable for the self-employment taxes even though only one of them had self-employment income, because the self-employment taxes are income taxes under subtit. A. Secs. 6013(a), (d)(3), 6017; sec. 1.6017-1(b)(2), Income Tax Regs.; cf. Guest v. Commissioner, 72 T.C. 768, 779-780↩ (1979).
6. SEC. 1402. DEFINITIONS. * * * (d) Employee and Wages. -- The term "employee" and the term "wages" shall have the same meaning as when used in chapter 21 (sec. 3101 and following, relating to Federal Insurance Contributions Act). ↩
7. Sec. 3121(d)(2) provides, in pertinent part, as follows: SEC. 3121. DEFINITIONS. * * * (d) Employee. -- For purposes of this chapter [chapter 21], the term "employee" means -- * * * (2) any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee; * * *↩
8. O'Brien v. Commissioner, 79 T.C. 776 (1982), involves ch. 23, not ch. 21, and so the statute does not automatically make O'Brien a part of the controlling law. However, the controlling regulation under O'Brien is identical in pertinent respects to the relevant regulation in the instant case and the Court in O'Brien examined and applied the common law concepts of the employer-employee relationship. We conclude that our opinion in O'Brien↩ is persuasive authority for interpreting sec. 3121(d)(2).
9. Respondent directs our attention to sec. 3121(b)(3)(A), which defines the term "employment" for ch. 21, Federal Insurance Contribution Act, taxes. That section excludes from the definition of "employment" services "performed by an individual in the employ of his spouse, and service performed by a child under the age of 21 in the employ of his father or mother". Because we hold that Cheryl fails to meet the common law test of an employee, we need not consider whether sec. 3121(b)(3)(A) affects the self-employment taxes. In addition, we note that the later amendment of this provision by sec. 9004(b)(1), Omnibus Budget Reconciliation Act of 1987, Pub. L. 100-203, 101 Stat. 1330, 1330-287, struck the language "performed by an individual in the employ of his spouse, and service" thereby making this question moot for the future.↩